596 A.2d 712

**ART WOOD ENTERPRISES**

v.

**WISEBURG COMMUNITY ASSOCIATION, INC.**

No. 1782, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Oct. 9, 1991.

724

Howard L. Alderman, Jr. (Levin & Gann, P.A., on the brief), Towson, for appellant.

Thomas J. Gisriel (Michael Gisriel and Gisriel & Gisriel, on the brief), Baltimore, for appellee.

Argued before BISHOP, BLOOM and HARRELL, JJ.

HARRELL, Judge.

This case arises from a decision of the Circuit Court for Baltimore County which remanded the decision of the Board of Appeals of Baltimore County (the Board) affirming the approval of a development plan by the County Review Group of Baltimore County (CRG).

## FACTS

Appellant, Art Wood Enterprises (Art Wood), is the owner of approximately ninety (90) acres of land located in northern Baltimore County upon which it proposes a development, known as "Coachman's Field," consisting of thirty-nine (39) single-family, detached homes. Appellee, Wiseburg Community Association, Inc. (Wiseburg), is a citizens' group composed of existing residents from the general vicinity in which "Coachman's Field" is planned.

The "Coachman's Field" development plan (the Plan) was reviewed by the CRG[1] pursuant to the Development Regulations of Baltimore County, Baltimore County Code (B.C.C.) § 26–166 *et seq.*, which require an "approved plan ... for all development" in the County. B.C.C. § 26–201.[2] On 30 April 1987, at a public meeting attended by representatives of Art Wood, Wiseburg, and several County agencies, the CRG ostensibly approved the Plan.

Wiseburg appealed the CRG's decision to the Board, which affirmed. Wiseburg then appealed to the Circuit

---

**1.** Baltimore County Code § 26–205(a) provides that "[t]he CRG consists of the directors of the department of public works and office of planning and zoning or their designated representatives."

**2.** B.C.C. § 26–168 defines "plan" as "the written and graphic representation of the proposed development prepared in compliance with section 26–203."

Court for Baltimore County. The circuit court (Brennan, J.) held that the CRG's approval of the Plan was "conditional" and as such was not authorized under the B.C.C. The circuit court remanded the matter to the Board, directing that the Board order the CRG to make a final decision regarding the Plan at a continued CRG meeting held pursuant to B.C.C. § 26–206.

Art Wood now contends that:

I. The circuit court erred in finding that the CRG's approval of the Plan was "conditional" and as such was unauthorized under B.C.C. § 26–206;

II. The circuit court erred in its conclusion that the CRG actually took final action to approve the Plan in a meeting that was closed to the public in violation of B.C.C. § 1–12 (the County's "Open Meeting" law); and

III. The CRG was not required to refer the Plan to the Baltimore County Planning Board (Planning Board) pursuant to B.C.C. § 26–207.

## STANDARD OF REVIEW

The role of the circuit court in reviewing the Board's decision is set forth in Md.Ann.Code art. 25A, § 5(U) (1987), which provides in pertinent part:

> Any person aggrieved by the decision of the board and a party to the proceeding before it may appeal to the circuit court for the county which shall have power to affirm the decision of the board, *or if such decision is not in accordance with law,* to modify or reverse such decision, with or without remanding the case for rehearing as justice may require. (Emphasis added.)

The circuit court's standard of review is thus limited to whether or not the Board's decision is "in accordance with law." The Board's decision may be set aside as not in accordance with law if it is arbitrary, illegal or capricious. *Mortimer v. Howard Research,* 83 Md.App. 432, 441, 575 A.2d 750 (1990). In *Mortimer, id.,* this court set forth the

proper standard for determining whether a Board decision is arbitrary, illegal or capricious:

> In making a determination of whether the Board of Appeals decision is arbitrary, illegal or capricious, the reviewing court must decide whether the question before the agency was fairly debatable. *Howard County v. Dorsey,* 45 Md.App. 692, 700 [416 A.2d 23] (1980), *rev'd on other grounds,* 292 Md. 351 [438 A.2d 1339] (1982). An issue is fairly debatable if reasonable persons could have reached a different conclusion on the evidence and, if so, a reviewing court may not substitute its judgment for that of the administrative agency. *Eger v. Stone,* 253 Md. 533, 524 [253 A.2d 372] (1969). The fairly debatable test is analogous to the clearly erroneous standard under Rule 8–131(c) and a decision is fairly debatable if it is supported by substantial evidence on the record taken as a whole. *Dorsey,* 45 Md.App. at 701 [416 A.2d 23], quoting *Sedney v. Lloyd,* 44 Md.App. 633, 637 [410 A.2d 616] (1980).[3]

This standard of review is in accord with that established by case law regarding zoning actions. *Miller v. Forty West Builders,* 62 Md.App. 320, 326, 489 A.2d 76 (1985). In this appeal, "the role of this court is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review." *Mortimer v. Howard Research,* 83 Md.App. 432, 442, 575 A.2d 750 (1990).

## DISCUSSION

### I

The B.C.C. authorizes the CRG to take any of three actions with respect to a proposed plan. First, the CRG

---

**3.** The standard of review the Board itself applies to appeals of the CRG actions is set forth in B.C.C. § 26–209(c):

> The final action on a plan shall be presumed correct and the person aggrieved shall have the burden of persuasion to show that such action was arbitrary or capricious, procured by fraud, or otherwise illegal.

may take "final action on the plan," B.C.C. § 26–206(b)(1), which is defined in the B.C.C. as "the approval of a plan as submitted, the approval of a plan as amended, or the disapproval of a plan ..." B.C.C. § 26–168. Second, the CRG may refer the proposed plan to the Planning Board pursuant to B.C.C. § 26–207. B.C.C. § 26–206(b)(2). Finally, the CRG may continue the meeting to a later date "in order to receive additional information or to resolve any development matter raised at the initial meeting regarding the plan." B.C.C. § 26–206(b)(3). The B.C.C. further provides that in the event an applicant for plan approval or any other person is required to submit additional information regarding the plan the CRG "shall continue its meeting to receive such additional information." B.C.C. § 26–206(c)(1).

■ The above provisions of the B.C.C. must be interpreted in light of B.C.C. § 26–203, which describes the nature and contents of the plan on which the CRG must act. B.C.C. § 26–203(a) provides that:

> [t]he plan shall set forth an *informative, conceptual, and schematic representation* of the proposed development in a clear and legible manner by means of maps, graphs, charts, or other written or drawn documents so as to enable the county and all reviewing agencies an opportunity to make reasonably informed decisions regarding the development. (Emphasis added.)[4]

The language of B.C.C. § 26–203(a) makes it clear that CRG approval is merely one stage (and an early one at that) of the land development review and approval process which takes a proposed development from its planning stages to its final form. As the Board stated in its opinion on the CRG's approval of the Plan:

---

4. B.C.C. § 26–203(b) sets forth a list of information the plan must contain, including, for instance, identification of landmark buildings, B.C.C. § 26–203(b)(8), current zoning of the subject property and surrounding properties, B.C.C. § 26–203(b)(10), and location of existing and proposed easements or rights-of-way, B.C.C. § 26–203(b)(28).

"[a]t the CRG stage, the developer need concern himself only with generalities and not specifics of his proposed development. He may be granted approval of the conceptual plans, but numerous agency permits, inspections, and approvals will follow ..."

Thus, the use of the term "final action on the plan" in B.C.C. § 26–206(b)(1) cannot be interpreted to mean that the plan on which the CRG acts need be in finished form, or that no additional review or more detailed information, even on subjects generally addressed in the development plan, will be necessary in subsequent stages of the development review and approval process. This court's dicta in the case of *Miller v. Forty West Builders*, 62 Md.App. at 320, 489 A.2d 76, is instructive. In that case, CRG approval of a plan was challenged because the overflow from a sewerage pumping station which was to serve the proposed development was operating over capacity and would pose significant health and safety hazards. The CRG had determined that the developer must have a study done and pursuant to a public works agreement must make any necessary corrections to eliminate any overflow. This court, in sustaining the CRG's action, stated as follows:

[P]ursuant to the CRG's determination, the public works agreement is the mechanism to assure that the facilities are properly improved so that the proposed subdivision poses no health or safety hazards to the existing community.

The CRG's approval in *Miller* was in some sense "conditioned" on the developer's performance of a later study. It was not necessary, however, for the CRG to hold another meeting in order to receive the results of that study, as the CRG's approval of the plan was not contingent on the study's results. Rather, the information obtained from the study was to be utilized at a later stage of the land development review and approval process, as foreseen by the CRG when it approved the plan. Thus, if a plan does not meet the requirements of B.C.C. § 26–203, or the CRG desires additional information regarding a plan, or wants to

settle or resolve particular development matters before it acts on the plan, then it is required to continue its meeting. But if the CRG has all the information before it necessary to approve the plan—that is, the plan satisfies the requirements of B.C.C. § 26–203—and the CRG approves the plan on the basis of that information, then the requirements of B.C.C. § 26–206 are satisfied, regardless of whether additional information regarding the proposed development may be necessary in future stages of the land development review and approval process.

With respect to the CRG's compliance with B.C.C. § 26–206 in the case *sub judice*, the circuit court ruled as follows:

[T]his Court agrees with [Wiseburg] that the approval was conditional and as such was an action which the CRG was not authorized to take pursuant to [B.C.C. § 26–206]. The [B.C.C.] provides in part that the CRG shall either take final action on a plan or continue the meeting in order to take additional information or resolve developmental matters. In this instance, the CRG should have continued the meeting in order to give the developers time to resolve the remaining matters stated above. The additional information was needed in order to properly grant or deny its [the plan's] approval.

The "remaining matters stated above" refers to the circuit court's earlier statement in its Memorandum Opinion and Order that "[t]he approval was conditioned upon the satisfactory resolution of several matters, including: sanitation, storm water management, planning and traffic." This statement in turn is evidently a reference to the "County Staff comments to be addressed" numbers one (1) through six (6) set out in the CRG meeting's minutes.[5] Those comments are as follows:

County staff comments to be addressed are as follows:

---

5. Minutes are taken at CRG meetings pursuant to BCC § 26–206(b), which requires the CRG to "summarize the action taken [at the meeting], in writing, as a permanent part of the plan file." The circuit

1. *Sanitation* required the trash pad near Lot No. 25 be relocated and the detail revised.

2. *State Highway Administration* comments numbered 1 through 6 must be addressed.

3. *Storm Water Management* comments stated that a storm water management waiver had not yet been granted, and that even if a waiver is granted, water quality would have to be provided. Approval of the Plan must be conditional upon satisfying storm water management requirements.

4. *Planning* comments numbered 1, 3, 4 and 6 must be addressed.

5. *Traffic* comments numbered 1, 2, and 4 must be addressed.

6. *Developers Engineering Division* comments required that a note be added to the Plan indicating that the 24 foot roadway will be posted with no parking signs.

*CONCLUSION:* The Plan was Conditionally Approved as described above.

■ We note at the outset that we do not consider the fact that the CRG used the word "conditionally" and the phrase "to be addressed" in the minutes evidencing its action on the Plan to be dispositive in determining whether that action was "a final action" in accordance with B.C.C. § 26–206. Whether the CRG's action was authorized by the B.C.C. must be determined by the content or effect of that action rather than by the name or description given it by the CRG. *See e.g. Houghton v. County Commissioners of Kent County,* 305 Md. 407, 412, 504 A.2d 1145 (1986) (quality or effect of trial court's action, rather than form of docket entry, determined whether order was appealable). *Cf.* 4 C.J.S. *Appeal & Error* § 94(b) ("question whether a judgment, order, or decree is final and appealable is not determined by the name or description which the court

court did not elucidate what evidence, if any, its review of the CRG's action was based upon other than the meeting's minutes.

below gives it, but is to be decided by the appellate court on a consideration of the essence of what is done thereby").

 "County Staff comments to be addressed" numbers one, two, four, five and six in the meeting's minutes refer to written comments on the Plan submitted to the CRG by various County agencies and included in the CRG's file on the Plan pursuant to B.C.C. § 26–205(f)(1). Our review of the record reveals that these comments are directives to Art Wood to amend details of the Plan in specific ways.[6] The information contained in the comments was part of the Plan file on 30 April 1987, the date of the CRG meeting. The CRG was not waiting for or seeking any "additional information" regarding these comments before approving the Plan.[7] All that remained for the CRG to do

---

6. For instance, State Highway Administration comments one through six referred to in the minutes are as follows:

 On review of the submittal of [the development plan], the State Highway Administration will require the site plan to be revised. The revised site plan must show the following revisions.

 1. A proposed entrance width of 25′–35 (30′ recommended) with 30′ radii.

 2. Show a 230′ paving taper to meet the proposed 195′ deceleration lane.

 3. Show a 100′ acceleration lane and 120′ taper to the northside of the proposed entrance.

 4. The proposed pipe crossing under the entrance must be a minimum of 18″ in diameter.

 5. A by-pass lane of 550′ including taper must be constructed on the west side of York Road.

 6. Show a distance of 24′ from the centerline of York Road (Route 45) to the face of curb construction for S.H.A. Type "A" concrete curb and gutter.

7. Wiseburg points out that the written comments of the Baltimore County Health Department on the plan, which are also included in the Plan file, recommend that CRG approval only be granted subject to nine additional soil percolation tests being conducted on the subject property, suggesting that these tests constituted additional information the CRG required before approving the Plan. The CRG, however, evidently did not follow the Health Department's recommendations, as no mention is made of the Health Department's comments in "Staff Comments to be addressed." Nor is the CRG bound to follow the recommendations of an agency regarding a plan. B.C.C. § 26–205(f)(1) requires only that such recommendations be "considered" by the CRG. In any case, had the CRG conditioned its approval on the

with regard to these agency comments was to review the amended Plan to make certain that Art Wood had indeed complied with the agencies' and the CRG's directives. Nor does the fact that further ministerial action by the CRG may have been necessary with regard to the Plan prevent the CRG's action from constituting "final action on the plan." *See Clarke v. Greenwell,* 73 Md.App. 446, 534 A.2d 1344 (1988) (finality of resolution of board of county commissioners approving zoning petition did not hinge on ministerial act of attaching changes to zoning map). Thus, contrary to Wiseburg's suggestion, the fact that technical amendments were made to the Plan after the CRG meeting to conform the Plan to the agency directives set forth in the meeting's minutes before the CRG members signed the approved Plan does not impeach the validity of the CRG's action. As noted earlier, the CRG is empowered to approve a plan *as amended.* B.C.C. § 26–168 (Emphasis supplied).

The third of the "[s]taff comments to be addressed" refers to stormwater management requirements. This comment suggests that the CRG's approval of the Plan was indeed "conditional" on the provision of "additional information" to the CRG regarding the grant of a waiver of such stormwater management requirements and on Art Wood's providing "water quality." Our review of the record, however, reveals that the Plan was granted a waiver of stormwater management requirements prior to the CRG's 30 April 1987 meeting, and that this fact was known to the CRG and others in attendance at the meeting.[8]

---

nine tests being *conducted,* as opposed to their results, the CRG's approval might still have constituted "final action on the plan" under the B.C.C. *See Miller v. Forty West Builders,* 62 Md.App. at 340, 489 A.2d 76.

**8.** James McKee, who had prepared the Plan, had been notified of the grant of the waiver request in a letter dated 28 April 1987, two days prior to the CRG meeting. And the minutes make it clear that the CRG and others in attendance at the 30 April 1987 meeting were aware of the waiver being granted, despite the suggestion of the third comment. The minutes note that at least one community resident in attendance at the meeting expressed concerns regarding "storm water

Stormwater management requirements are set forth in B.C.C. § 14–151 *et seq.* The responsibility for review and ultimate approval of a development's *stormwater management plans* (as opposed to development plans that receive CRG review and approval) is vested elsewhere in the County government than the CRG. B.C.C. § 14–156(a). With regard to waivers of stormwater management requirements, B.C.C. § 14–155(c) provides that:

> the director of the department of environmental protection and resource management or his designated representative may grant a waiver of the stormwater management requirements for individual developments, provided that the applicant submits a written request containing descriptions, drawings, calculations, and any other information necessary to evaluate the proposed waiver request
>
> . . .

█ B.C.C. § 26–203 provides with respect to stormwater management requirements only that a plan must "contain information" regarding "stormwater management areas," B.C.C. § 26–203(b)(18), and that this information must be sufficient to "enable the county and all reviewing agencies an opportunity to make reasonably informed decisions regarding the development." B.C.C. § 26–203(a). As B.C.C. § 14–155(c) clearly requires that information be provided to the County of a nature specific enough to satisfy the standard set forth in B.C.C. § 26–203(a), the fact that Art Wood had been granted a stormwater management waiver for its proposed development was enough to enable the CRG to take final action on the Plan as submitted without the need for "additional information."

The meeting's minutes also state that "even if a waiver is granted, water quality would have to be provided." This statement is evidently a reference to B.C.C. § 14–155(c),

---

which provides that "water quality practices may be required for any development, even when peak stormwater requirements are waived." Again, however, enforcing these requirements is not the responsibility of the CRG, but of other County officials at different stages of the land development review and approval process. That the grant of a waiver of stormwater management requirements does not settle every issue regarding a development's stormwater management plans, or that stormwater management plans may be revised subsequent to approval by the CRG of a plan conforming to the requirements of B.C.C. § 26–203, does not hamper the CRG's ability to take final action on a plan.

■ In ruling on the CRG's action on the Plan, the Board stated as follows:

> The follow-up activities after CRG approval were not to correct aspects of the [P]lan that [Wiseburg] contends had "conditional approval," but were a part of the orderly sequence of functions that take a schematic and conceptual plan through a series of permits necessary in the development process.

Our review of the record reveals that none of the "comments to be addressed" referred to in the minutes of the CRG's 30 April 1987 meeting actually constituted "additional information" that the CRG needed before approving the Plan. Therefore, no continued meeting was required pursuant to B.C.C. § 26–206, and the CRG was authorized to approve the Plan by directing that the Plan be amended in accordance with the referenced agency comments.

## II

In addition to its decision that the CRG's action on the Plan was a "conditional approval" and therefore not a "final action" under B.C.C. § 26–206, the circuit court ruled that the CRG's action on the Plan violated B.C.C. § 1–12, which provides, in pertinent part, as follows:

(a)(1) [A]ll meetings of [any legislative or administrative body of the County], at which there is a collective decision by a majority of members of the body, a collective commitment by a majority of members of the body to make a decision, or an actual vote by a majority of the members of the body upon a motion, proposed resolution, order, or ordinance, shall be open to the public;

(2) [A]ll meetings of two (2) or more [County officials] at which there is a decision, discussion, or determination of official policy or action shall be open to the public[.]

The circuit court apparently reasoned that since the CRG's "conditional approval" of the Plan rendered some further decision by the CRG regarding the Plan necessary, and that, since the CRG never held a public meeting regarding the Plan after 30 April 1987, this decision must have occurred at a private "meeting":

The action taken on April 30, 1987 by the CRG was a conditional approval. The CRG's final approval came at a later meeting, not open and advertised to the public, and therefore, was a violation of the [B.C.C.].

For the reasons stated below, we do not believe that this issue was properly before the circuit court.

It is a well-established principle that judicial review must be sought in the particular manner provided for by the legislature where the legislature has so provided.

It is apparent that in giving the right of appeal to courts, the Legislature conferred a special statutory jurisdiction on the courts and made the exercise of that jurisdiction the only right of the court to review the local board, to the exclusion of any common law remedy. No principle is better established than that in exercising a statutory power, a court is without jurisdiction unless it complies with the statute.

*Scherr v. Braun,* 211 Md. 553, 563, 128 A.2d 388 (1957), *quoted in In re Glenn S.,* 293 Md. 510, 514, 445 A.2d 1029 (1982). *See also Lee v. Secretary of State & Mahoney,* 251 Md. 134, 139, 246 A.2d 562 (1968) ("Where there is a

statutory appeal from administrative or official decisions, jurisdiction of the courts on appeal is limited to that con-- ferred by the statute.").

■ Wiseburg appealed the Board's order affirming the CRG's action to the circuit court pursuant to Maryland Rule B2,[9] lumping its claim that the CRG's action violated the County Open Meetings law together with its claims under B.C.C. § 26–206. B.C.C. § 1–12, however, does not provide for appeals of official actions alleged to be in violation of the rights and privileges of that section pursuant to the B Rules of the Maryland Rules of Procedure. Subsection (f) of B.C.C. § 1–12 provides in pertinent part as follows:

> **Enforcement.** Any person denied the rights and privileges conferred by this section may proceed to enforce those rights and privileges by petition for mandamus supported by an affidavit showing good cause, in the circuit court of the county.

Because the jurisdiction of the circuit court to review an alleged violation of the Open Meetings law was limited to that method of review conferred by B.C.C. § 1–12(f), the issue was not properly before the circuit court as presented by Wiseburg.[10]

---

**9.** Although Wiseburg's Order for Appeal cited Maryland Rule B2 as the authority for its appeal of the Board's decision to the circuit court, it is in fact B.C.C. § 26–133 of the B.C.C. and Md.Code Ann. art. 25A, § 5(U) (1990) which grant a right of appeal from Board decisions.

**10.** We note that the Maryland Sunshine Law, Md. State Gov't Code Ann. § 10–501 *et seq.* (1984), provides support for strict application in the case *sub judice* of the principle that judicial review must be sought in the particular manner provided for by the legislature. The Maryland Sunshine Law is a "touchstone" for other Open Meetings laws in the State, *City of College Park v. Cotter*, 309 Md. 573, 586, 525 A.2d 1059 (1987), and the legislative policies expressed in the Maryland Sunshine Law therefore inform our interpretation of B.C.C. § 1–12(f). Section 10–510 of the Maryland Sunshine Law provides for enforcement of its provisions, and subsection (a)(2) states that "[t]his section does not authorize a court to void an action of a public body because of any violation of this subtitle by another public body." In conjunction with the 45–day statute of limitations on the filing of petitions seeking judicial review of alleged violations of the Law, § 10–510(a)(2) and (3), this provision expresses a legislative intention to

## III

■ Wiseburg contends that, even if we disagree with the grounds for the circuit court's decision, we should still affirm on the ground that the CRG, rather than approving the Plan, was required to refer the Plan to the County Planning Board pursuant to B.C.C. § 26–207. Even though this question was not decided below, we decide it in order to avoid the expense and delay of another appeal. Md.Rule 8–131 (1990). *See Dill v. State,* 24 Md.App. 695, 332 A.2d 690 (1975).

As stated earlier, the CRG has three options with respect to a proposed plan at its initial meeting. It may take final action on the plan, continue its meeting, or refer the plan to the County Planning Board pursuant to B.C.C. § 26–207. B.C.C. § 26–206(b)(2). B.C.C. § 26–207 provides in pertinent part as follows:

> In accordance with section 26–206(b) or (d), the CRG shall refer the plan to the planning board in the following circumstances:
>
> (1) The proposed plan conflicts with the master plan; . . . [11]

The master plan for Baltimore County for the years 1979–1990 designated the area that the "Coachman's Field"

---

avoid the undoing of multiple stages of the deliberative process because of a violation of the Law by one public body at an earlier stage of that process. Those aggrieved by the actions of public bodies are therefore forced to press their claims before a court as soon as possible. In the case *sub judice,* Wiseburg did not directly raise by petition or mandamus the alleged violation of B.C.C. § 1–12 by the CRG to the circuit court, but instead lumped this claim together with its other claims and presented them all to the Board, which after a de novo hearing affirmed the actions of the CRG. The legislative intent expressed in the Maryland Sunshine Law is all the more reason to insist that Wiseburg have conformed its effort to have judicial review on this matter to the manner provided by the B.C.C.

**11.** Baltimore County Charter § 523(a) defines the specific role and import of the master plan as follows:

The master plan shall be a composite of mapped and written proposals setting forth comprehensive objectives, policies and standards to serve as a guide for the development of the county.

development lies in. as a "rural and agricultural area." It states that one of its recommended goals for rural and agricultural areas is to "limit development in these areas essentially to agriculture and agriculturally related uses." Wiseburg argued before the Board that as the proposed "Coachman's Field" development was a residential development, it could not constitute an agricultural or agriculturally related use and therefore must conflict with the master plan.[12] Art Wood, on the other hand, maintained that the Plan did not conflict with the master plan because it was "rural in nature" and because there were no specific uses designated in the Plan that could give rise to a master plan conflict.[13] In addition to the arguments of counsel, our review of the record indicates that the Board heard testimony on this matter from County officials. Based on this evidence, the Board found that Wiseburg had not met its burden of proving that the CRG's action was arbitrary, capricious, or otherwise illegal under B.C.C. § 26–206. *See supra* n. 3. It also appears from our review of the record that the intent of the master plan, as well as ascertainment of any conflicts between the master plan and the proposed

---

12. Wiseburg has refined its argument somewhat since its appearance before the Board, and now argues that the Plan clearly conflicted with the master plan because it was not a single farm residence on a twenty acre parcel of land. This contention is based on the statement in the master plan that "it is recommended that the County consider an overlay district to the Zoning Ordinance applicable to [rural and agricultural areas] requiring that any development other than single farm residences on twenty acre parcels be subject to special Development Evaluation review ..." This statement, however, does not mean that any use of land in the area other than single family farm residences on twenty acre parcels necessarily conflicts with the master plan. Rather, it is simply a recommendation to the Baltimore County Council to amend its zoning regulations, a recommendation which the Council has not implemented.

13. Art Wood has also refined its argument on appeal to this court. It points out that the subject property is in a resource conservation zone dubbed "rural-residential," and that "one family detached dwellings" are uses permitted as of right in that zone. From this it reasons that single family, residential uses such as the planned "Coachman's Field" development are equivalent to "agriculturally related uses" and are by definition consistent with the master plan.

development plan, was addressed by the component departments of the CRG when (prior to the filing of the Plan) they met with Art Wood in a pre-development conference pursuant to B.C.C. § 26–202(2). Deferring to the expertise of the Board in making such judgments, we conclude that a reasoning mind could have determined based on the evidence that the Plan did not conflict with the master plan, and that, consequently, the CRG was not required to refer the Plan to the Planning Board pursuant to B.C.C. § 26–207. We therefore reverse the circuit court's decision and remand to the circuit court for entry of an order reinstating the decision of the Board.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED FOR ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.